And we'll move to our third case this morning, which is Ciara Vesey versus Envoy Air. All right, I see Ms. Aiken and Ms. Fiore, so you may proceed, Ms. Aikens. Thank you, Your Honor. Good morning, and may it please the court, Carla Aikens on behalf of the plaintiff Ciara Vesey. Excuse me. Your Honor, we are, Your Honors, we are here today because we are asking this panel to reverse the findings of the district court dismissing Ms. Vesey's claim in total. The main three, I will dispense with the recitation of the facts. I assume that Your Honors are familiar with the facts based upon the briefings. Is that okay? Yes. Yes. There are three main reasons that the district court erred. First, none of the factual inquiries were made in Ms. Vesey's honor, excuse me, favor. She's raised at least a question of fact that she was retaliated against for reporting discrimination. Second, the cat's paw theory applies to Envoy's conduct in this matter. And third, Ms. Vesey has stated a claim for hostile work environment. I think the most important thing to keep in mind here is that, and honestly, I don't know what else Ms. Vesey could have shown to prove that the steps and the process that she had to endure here after she reported discrimination were clearly discriminatory. Ms. Vesey had been working there for four years, pretty much without issue. In this particular year in which she was terminated, she had a number of issues with her supervisor, Ms. White. She had already reported her for discrimination earlier in the year. Envoy had, American Airlines or Envoy, it's unclear in terms of, I think American Airlines does most of the HR work. But they counseled her with respect to the interview process that Ms. Vesey's sister had undergone because they basically, Ms. White decided not to hire her because she was related to Ms. Vesey. That's what Ms. Vesey had claimed. She also claimed that she had not been able to partake in opportunities to advance and that she and other African-American employees also had the same issue there. And again, they had counseled Ms. White with respect to all of these issues. This was earlier in the springtime of the same year that she was terminated. And so then when all of these things happened with respect to the comments that were made by her colleague, Mr. Massenburg, he was fired. And the district court seemed to focus on that as if that were the remedy for everything that occurred in this case. And unfortunately, as the IDHR, which was the Illinois Department of Human Rights, when they interviewed several of the employees, they all indicated that the work environment became more hostile after Mr. Massenburg was fired. Massenburg, excuse me. And which is what Ms. Vesey was claiming. It was clear that Envoy was experiencing understaffing and that with his firing, Ms. White was having issues in terms of employees and that she wanted him to stay, but she had no problem with Ms. Vesey being terminated. And that's because she had already had issues with Ms. Vesey for reporting her in the past. Now, there were a number of things that Ms. White was supposed to do in terms of, after these comments were made, after Mr. Massenburg was fired. There were a number of things that Ms. White was supposed to do to make sure that the environment was welcoming. And again, American Airlines indicated all these things during the IDHR investigation, that she was supposed to have spoken to Ms. Vesey, at least acknowledge that they were looking into things that she felt bad, something, but she never speaks to her at all. In fact, she avoids her like the plague. The deposition of- What evidence do you argue in your brief, you made the same argument in your brief that you're making now. And that is that, I think in your brief, you said the environment deteriorated substantially at your client's expense after Eric Massengarb was terminated. And what evidence in the record do you specifically have in mind and how does it connect with Ms. Vesey's race? Well, there's two, there's, well, let me just be clear, because the claim, we had sought to amend the complaints to include a race claim. This particular claim that we are appealing was based upon the retaliation, not necessarily because of her race, but because she had, because she reported a race violation. Because she reported Mr. Massengarb's entirely inappropriate comments. Correct. Okay. Yes. And so therefore, while she does have claims with respect to the race, we were not able to bring those because the court would not allow us to amend the complaint. So regardless of her race, it was the fact of her bringing up these comments that are as the basis of our retaliation claim. Okay, but doesn't the difficulty that she runs into arise from what the company found to be violations of its, what are they called, the travel policy? You said, does she run into difficulty because of those violations? The difficulty she runs into is there's an investigation that's commenced, correct? Well, I don't think there's a difficulty there. In fact, I'm sorry. No, they ultimately conduct an investigation and find affirmatively that she violated the travel policy. Well, there's a couple of issues with that. And I will go back to, we cited the Stalter versus Walmart case, because I think what happened here is the same thing that the court instructs there. It's the severity of the punishment. The court talked about, this strikes us as swatting a fly with a sledgehammer. So if you wanna go through all of the things that they claim that she did, it started, and the issue is that it started because of this alleged anonymous complaint that Ms. White's had coerced another supervisor to do, someone who wasn't even there, who didn't see anything that might've happened in it, and had to do with what Ms. Vesey's intent was to travel on that day to get an alleged voucher. There's no violation for that, to get a voucher. See, the difficulty that I have with that argument, and I looked at the summary judgment briefing. And when I look at your response to the company's motion for summary judgment, in paragraph 52, the company set forth in paragraphs A through V, as in Victor, all of the facts that it believed, based upon the findings that Valerie Durant made, why a travel policy violation occurred. And the only thing that your client said in response to that collection of facts is the plaintiff alleges that this paragraph contains both disputed material and immaterial facts. But isn't it your obligation, or your client's obligation, at that stage of the litigation, to affirmatively come forth with evidence, creating a trial issue? We did, Your Honor, and I think part of the issue is the way in which that district sets up the way that you have to respond to the facts. And so you have to respond in such a way that I think it's not clear, in terms of how it's laid out. But in terms of our briefing, we absolutely did respond. And that was in 102 to 104, the response, which was A102 to 104, which is not the page numbers from the lower court, but the appendix numbers, that we talked about the different issues that Ms. Vesey had there. And part of the problem with the, and as we indicated in our briefing, part of the issue with the investigation is that none of those things actually violate the travel policy. When we, I went through, I think in the reply, just to go through all the things that were in the record below that the court had to consider. And we went through each of the trips that they indicate. So the first issue is that when Ms. Vesey was actually terminated, they didn't tell her all of these things. There was not all, you did this, you did that. They indicated that she had violated the policy, but not how. So we went through all of the trips, all of the things that they claimed. And the issue again is, does that arise to the level of something that you would be terminated for? Again, that's sledgehammer. I don't see, and going through each of those trips, the first one was that San Juan trip. They said that they accused her of traveling out of sequence. And so just to say, just to go through, to answer your question with respect to our response there, they don't necessarily flesh out all of the details, but we did flesh out the details with respect to the record in terms of what our response was to each of those allegations. I thought the company took the position, among other things, that if you buy a so-called revenue ticket, I think that just means if you purchase a ticket, like an ordinary customer would be. But as an employee, you put yourself on the standby list at the same exact time. And then later drop your revenue ticket in exchange for some kind of coupon or refund or credit or something going forward, that that violates the travel policy. And as I read her deposition, she admitted to doing that with respect to the flight that was going to or from Dallas or LaGuardia. Right, but the issue there was that there wasn't, I don't believe it was possible for her to actually, to do what they were saying in terms of it being a violation of the policy. I think, I understand what they're stating the policy is, but I don't believe that that was actually a policy. That's not how Ms. Vesey interpreted the policy, nor does she think that that was an actual violation of any travel policy. I think the problem is that they clearly went back through here, Ms. Vesey had already complained to the IDHR at the time that they came, they sent two individuals all the way from Dallas to come and question her in person. None of this happened when they were investigating any of the other allegations with respect to Mr. Massengar, they did everything by phone. But they sent these two individuals to come and intimidate her and ask her two hours worth of questions about everything that she had ever done. And the issue is that Ms. McMurray had admitted to doing things, Ms. White did things. They said, initially they said, well, she was signing in under other people's sign, S-I-N-E, which was basically using their login, I guess, to do things. And Ms. White said that they did that, and Ms. McMurray said that they did that. Nobody thought that that was a big deal. These things are not, these things don't arise to the level of terminable offenses. What is the loss to American Airlines if she is holding a, let's just say, if she was holding a standby reservation and she booked a ticket, or how much time passed between, they didn't lose any money, but instead they did spend money to send two people. If I could interrupt, that's not really the focus of the inquiry in a discrimination or retaliation claim. The question is not whether her firing was justified as a matter of enforcing the personnel rule, the workplace rules, but it's a question of whether it was retaliatory. We need a causal link between the firing and her complaint against her coworker. That's what's missing here, whether, this is not just an employment dispute, and in particular a retaliation for complaining about discrimination claim. So- You're saying it's- Just to argue that they were unjustified in firing her because it was an overreaction to what she did isn't the point. The point is whether that was the real reason or whether the real reason was retaliation. Right. And I think with respect to the retaliation, it's the timing. All of these, nothing happened to her the entire time that she was there. Again, when she's testifying, she's talking about things that occurred that she was doing the whole time other people did. Other people didn't get into trouble for it, even after apparently Envoy found out about it, at least during the course of the litigation, and still nothing was done to them. And so at this point, it becomes, that's the retaliation. It's that you, all of a sudden, all of these things are heightened and the things you went in there to initially find, well, they didn't find that it was a, they shifted. So sometimes it may have been a violation if she had taken her purse and wasn't planning to travel. But do we really, I mean, the fact of the matter is that can certainly be pretext. If we say that the reason that she was fired is because she took a voucher that she never used. I mean, the fact that they're saying that these things rise to the level of termination when the one person who did do something, so there was Mr. Watkins, who apparently had changed her reservation for her, and he got some type of a write-up, he didn't get terminated. Ms. White and Ms. McMurray admit to doing things that would violate the travel policy, and nothing happened to them. I thought your client, though, was on probation, right? Well, they said that, but that's a, she didn't, I mean, and Courtney, when she filled out her, the IBHR questionnaire, and it asked if she was on, she had no idea that they were holding this over. This is something that came up after the fact, wasn't indicated to her during her, when she was terminated, during her meeting. And this was something that they, basically what, as we see it, in terms of viewing the facts in a light most favorable to her, she complained about this situation. Within a few weeks, Ms. White is coercing an employee to report her for apparently not traveling because she had a purse, and somehow someone was supposed to know her intent, and then that was the initial reason. And then they went in and they investigated, and they said, well, okay, that, maybe not that, but these other things, such as things that didn't cost American Airlines any money at all, we're going to spend a full day for people to fly from Dallas to investigate her. And it's the fact that Ms. White did have a discriminatory animus, and the timing of it together, that should be enough to get her passed summary judgment. All right, thank you very much. Thank you. Ms. Fiore, you're still on mute. My apologies, your honors. Good morning, Lindsey Fiore on behalf of Envoy Air Incorporated. Present in my office with me is Chris Papiano, Vice President of Legal for Envoy. May it please report. Your honors, in order to establish a retaliation claim, Ms. Bessie must show a causal connection between her protected activity and any adverse actions she suffered. She has not established that causally. An anonymous report by Ashley Emmerich of Ms. Bessie's questionable conduct with respect to her travel activities prompted an independent investigation from Valerie Duran in Revenue Management, partnered with Irma Stevens in Human Resources. That Ms. Bessie's intervening questionable conduct and that subsequent investigation are intervening ads that break any causal link. Ms. Bessie has attempted to present a cat's paw theory of liability here. A typical cat's paw case involves a biased, subordinate employee who does not have decision-making authority influencing a unbiased decision-maker. Ms. Bessie has attempted to make that argument in reverse, claiming that her manager, Teresa White, who had the authority and ability to fire Ms. Bessie outright, instead coerced a subordinate unbiased employee to file a complaint against Ms. Bessie with the intent of eventually getting her fired. Ms. Bessie did not present any evidence to the district court at summary judgment as to this alleged coercion or any retaliatory intent on the part of Ms. White. Ms. Bessie has insisted that the district court erred in not considering additional testimony from Ashley Emerick that would have established those things. That testimony was available to Ms. Bessie. It existed and was known at the time of summary judgment. It was not presented to the court due to her own error. Ms. Bessie has not presented this court with any legal authority that would rebut the well-established peace law that under these circumstances, the court need not award a second chance. But in any case, as the district court properly concluded, this additional evidence wouldn't have made a difference in its summary judgment order because Ms. Bessie hasn't shown any retaliatory bias on the part of Ms. White. In addition to showing retaliatory bias, she also must show proximate cause to proceed with the cat's paw theory. In other words, that Ms. White's bias was the proximate cause of Ms. Bessie's termination. She also cannot do that. At worst, Ms. White's bias prompted a complaint to be lodged and that complaint did not result directly in Ms. Bessie's termination. It resulted in an independent investigation by Mr. Rand who made findings and conclusions, presented those to Ms. Stevens, who did her own review of Ms. Bessie's disciplinary record and made recommendations as to her termination. And the termination was then subsequently approved by a separate panel of three other envoy employees. These are all breaks in the causal link and cannot establish proximate cause here. It defeats the cat's paw theory. To the extent that Ms. Bessie claims pretext based on policy violations that allegedly don't exist as she has suggested, envoy presented significant evidence of the policies that exist that governed Ms. Bessie's travel activities and significant evidence as to how Ms. Bessie's activities violated those policies. The district court pointed this out. Envoy presented a sworn affidavit from Valerie Durant in addition to Ms. Durant's entire investigative trial. I'm happy to discuss with the court the different ways in which Ms. Bessie violated envoy policies, but suffice it to say there is no requirement that the company lose money in order for her to have violated the policy. This is for a reason and it's not the issue for the court, but to the extent it is, one of the things that Ms. Bessie did was change her own revenue reservations using envoy's internal systems. By doing that, she avoided change fees or ticket reissuing fees that would likely and typically apply to any other revenue passenger. Ms. Bessie would ultimately, in order to prevail on a tax cut theory, must show that Ms. White had some influence on either the investigation or the recommendations that were made as a result. She has not done that. She has alleged that Ms. White was in constant communication with Irma Stevens and Human Resources. As the district court properly pointed out, there were two emails that Ms. Bessie presented evidence of Ms. White communicating with Ms. Stevens. Ms. Bessie has claimed that Ms. White asked Ms. Stevens if she could proceed with termination. Again, there is no evidence in the record that that inquiry ever happened. The two emails are clearly not constant communication. And in any event, the evidence is clear and undisputed that Ms. White was not involved in the termination decision, that she did not even know that Ms. Bessie would be terminated until after the decision had already been made. Ms. Bessie cited the Nichols case in her reply brief, which actually supports Envoy's position even further. In that case, there was evidence that the decision-makers had considered input from an allegedly biased subordinate, but the court held there was no proximate cause because the decision-makers also relied on their own knowledge and observations in making the termination decision. The same is true here. Ms. Durant relied on her own knowledge and observations in conducting an independent investigation. Ms. Stevens relied on Ms. Durant's conclusions and her own knowledge and expertise of Ms. Bessie's disciplinary record and envoy policies in making her recommendations. This lack of proximate cause is fatal to Ms. Bessie's claim. She's also argued that pretext exists here because two comparators were allegedly treated differently, Ms. McMurray and Michael Watkins. Ms. Bessie's attempts to equate her activities to Ms. McMurray's activities do not hold true. Ms. Bessie was terminated for violating envoy policies that applied to her activities as a revenue passenger. Ms. McMurray testified as to certain activities she undertook as a standby or non-revenue passenger. There isn't any evidence that what Ms. McMurray admitted to violate the envoy policy at all. But where Ms. Bessie's claim really fails is the lack of knowledge on envoy's part that those alleged violations even occurred. As the district court correctly pointed out, without any evidence of knowledge on envoy's part, there cannot be any inferences drawn from the two allegedly differential treatment. As to Mr. Watkins, he did receive corrective action. Mr. Watkins was not on a final warning at the time of his alleged travel policy violation. Ms. Bessie was. She was on a final warning that is in effect for two years. She has not disputed that. And to the extent that there are similarities between Ms. McMurray, Mr. Watkins, and Ms. Bessie, these similarities are only relevant if those individuals are also outside of her protected class for purposes of establishing. This is a retaliation claim. Ms. Bessie does not have a disparate impact, I'm sorry, a disparate treatment race determination claim. She's alleged retaliation with respect to her termination. The relevant protected class here is individuals who complained in the workplace. There's no evidence one way or the other whether Mr. Watkins ever made any complaints in the workplace. There is evidence presented by Ms. Bessie that Ms. McMurray made complaints in the workplace. And while Ms. Bessie disputes the merits of Ms. McMurray's discrimination complaint, she can't dispute that it exists. For purposes of the pretext analysis, Ms. McMurray and Ms. Bessie are in the same protected category. That is employees who have complained at work. To the extent there is any differential treatment between the two of them, no retaliatory inferences can be drawn from that. And finally, Ms. Bessie claims that Envoy has not fired other people for travel abuse and that this somehow establishes pretext. It is not Envoy's burden to establish the lack of pretext, it is Ms. Bessie's burden to establish it exists in the first place. But in fact, Envoy did present evidence to this court. It's at page 22 of Envoy's response brief of other employees at the same airport where Ms. Bessie worked who were fired for travel abuse. Ultimately, Ms. Bessie not presented an issue of fact on her retaliation claim and it was properly dismissed by the court on summary judgment and the court properly decided not to alter that judgment. As to Ms. Bessie's hostile work environment claim based on race, it is based on a single, isolated, unfortunate and inappropriate incident in the workplace. She reported it, it was investigated and that employee was fired. This is appropriate remedial action. And while Ms. Bessie has claimed that the district court made improper factual determinations about that claim, it's not clear what those factual determinations were. Envoy presented to the court on summary judgment, Ms. Bessie's testimony verbatim as to what happened before. The district court necessarily accepted it as true. It made a legal determination that this isolated incident while regrettable did not rise to the level of severe and pervasive harassment. But in any case, as the district court also concluded in its order on the motion to alter or amend, the crux of its holding was that Ms. Bessie had not established employer liability. She made the complaint and it was remedied. To the extent that Ms. Bessie claims she suffered additional instances of harassment in the workplace, there is no link between those allegations of harassment and her race. She admitted in her deposition that no other race-related remarks or gestures or inappropriate conduct occurred after Mr. Masendar was fired. To the extent that she claims she suffered additional acts of harassment, they would go to a claim of hostile work environment based on retaliation, not based on race. But looking at those additional acts that Ms. Bessie claims, either they lack record support, they don't have any relation to her protected activity or both. For example, Ms. Bessie has claimed that Teresa White said she wanted her fired. The only evidence of this is Ms. Bessie's own testimony about what somebody else told her Ms. White said. It's inadmissible hearsay evidence and not appropriately considered on summary judgment. She claims that Ms. White looked at her travel records and encouraged other employees to do the same. There is no evidence of this in the record, but even if there was, it's unclear how it would rise to the level of an objectively hostile work environment or whether it has anything to do with Ms. Bessie's complaint. And finally, she argues that Ms. McMurray didn't want to work with her, Ms. White didn't talk to her after her complaints. Mere ostracism in the workplace does not rise to the level of an objectively hostile work environment. And this is noted in the McKenzie case cited in our brief, a supervisor who was standoffish or rude or unapproachable, none of that rises to the level of an objectively hostile work environment. Unless the court has any questions for me, we will rest on our brief. All right, thank you very much. With the honors. And Ms. Aikens, I think you had used most of your time. You may have an extra minute if you have something to say in rebuttal. Thank you, your honor. I think the main question is whether or not a jury looking at this evidence that Ms. Bessie has presented would say that after she reported these issues, these comments that were made, was the door basically closed on her with respect to her employment? Was she ushered out the door? And I think that she has at least presented a question of fact as to whether that occurred. To state that all the causal link was terminated would be false because the whole entire reason that they even started to investigate and look into all these issues was because of Ms. White and her coercion in the first place. There certainly is support that the court should consider this evidence. It was not a mistake. We ordered the transcripts and it wasn't received. We had an issue with respect to the scheduling of the deposition and that was why it wasn't received. But I would respectfully request that the court reverse the district court on the basis of the proofs. Thank you. All right, thank you very much. And our thanks to both counsel. The case is taken under advisement.